# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 17-CR-0066 (PJS/HB) |
| Plaintiff, | |
| v. | ORDER |
| (1) RYAN RANDALL GILBERTSON and (2) DOUGLAS VAUGHN HOSKINS, | |
| Defendants. | |

Joseph H. Thompson, Kimberly A. Svendsen, and Melinda A. Williams, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Kannon K. Shanmugam, Adam D. Harber, and Colette T. Connor, WILLIAMS & CONNOLLY LLP; William J. Mauzy and Kaitlin Ek, MAUZY LAW, PA; and John A. Sullivan, BEST & FLANAGAN LLP, for defendant Ryan Gilbertson.

Aaron J. Morrison, WOLD MORRISON LAW, for defendant Douglas Hoskins.

Defendants Ryan Gilbertson and Douglas Hoskins were indicted on multiple counts of wire fraud, securities fraud, and conspiracy to commit securities fraud for their participation in a scheme to manipulate the price of shares of Dakota Plains, Inc. ("Dakota Plains"), a publicly traded company that owned and operated a North Dakota oil-shipping facility. A jury convicted Gilbertson of all but one charge and convicted Hoskins of six of the sixteen charges against him. This matter is before the Court on defendants' motions for acquittal; Gilbertson alternatively seeks a new trial. For the reasons that follow, defendants' motions are denied.

# I. BACKGROUND

Viewing the evidence in the light most favorable to the government, the jury could have found the following:

Gilbertson is a former derivatives trader. In November 2008, Gilbertson and two other individuals—Michael Reger and James Sankovitz—founded Dakota Plains (then known as Dakota Plains Transport, Inc.). Trial Tr. ("TT") 148-49, 227, 314. Gilbertson and Reger both concealed the extent of their involvement in the company by installing their fathers as officers and the sole members of the board of directors. TT 149-51, 636. In reality, however, Gilbertson, Reger, and Sankovitz exercised complete control over the company, with Gilbertson effectively making the financial decisions. TT 227, 231, 252, 293, 636.

In early 2011, Gilbertson caused the company to issue $3.5 million in promissory notes (the "senior notes"), over $1 million of which were held (directly or indirectly) by Gilbertson. TT 171-78; Gov't Ex. 46 at 4. A few months later, after installing an unqualified and compliant CEO, TT 272-73, 293, 311, Gilbertson and Reger caused the company to issue $5.5 million in additional notes (the "junior notes"), TT 307-10. Most of the junior notes were held (directly or indirectly) by Gilbertson and Reger. TT 312-13; Gov't Ex. 133 at 4.

The junior notes included a complex bonus provision under which the noteholders would be entitled to additional payments if the company went public via an initial public offering ("IPO"). TT 310-11; Gov't Ex. 131 at 27; Gov't Ex. 140. Later, Gilbertson caused the company to consolidate the senior and junior notes so that the bonus provision applied to *all* of the (consolidated) notes. TT 329-31, 336-37, 348-49, 358; Gov't Ex. 181 at 2-3. Gilbertson also arranged for the bonus provision to be broadened, so that it would apply not only in the event of an IPO, but also in the event that the company went public via a reverse merger. TT 331, 337. In addition, Gilbertson changed the bonus formula so that the size of the bonus depended on the average price of the stock during the first 20 days of public trading. TT 338, 349.

After ensuring that he would profit handsomely in the event of a reverse merger, Gilbertson arranged for Dakota Plains to enter just such a transaction with the help of Thomas Howells, a consultant with whom Gilbertson had previously worked. TT 358, 623. As Gilbertson well knew, regulatory restrictions meant that the vast majority of shares in the company that resulted from the reverse merger could not be traded during the six months following the merger; in fact, only 92,400 shares (out of tens of millions) would be available for trading during that six-month period. TT 640-42, 644-45, 668; Gov't Ex. 262. This provided a golden opportunity for Gilbertson to manipulate the price of the stock.

Gilbertson insisted, during the negotiations leading to the reverse merger, that 50,000 of the 92,400 "tradeable" shares be sold to a buyer of his choice prior to the merger and that this transaction be kept "strictly confidential." TT 659-60, 674, 691-92; Gov't Ex. 404a at 6. Howells somewhat reluctantly agreed to this arrangement. TT 662. The condition that Gilbertson be allowed to purchase more than half of the freely tradeable shares did not appear in any of the merger documents. TT 674, 1748-49. Moreover, Howells testified that Gilbertson was unwilling to agree to a contractual provision that would have prohibited him from trading those 50,000 shares after the merger. Instead, Gilbertson merely offered a "gentlemen's agreement" not to trade those shares during the 90 days after the merger closed. TT 675-79.

Gilbertson chose Douglas Hoskins to receive the 50,000 freely tradeable shares. Hoskins was a failed real-estate agent who played on and managed Gilbertson's polo team and also served as Gilbertson's personal polo coach. Gov't Ex. 626 at 3-5, 7-12. Hoskins had absolutely no experience trading stock, Gov't Ex. 626 at 18, and, as far as the record discloses, absolutely no knowledge of the energy industry. Hoskins was also broke; in fact, Hoskins owed tens of thousands of dollars in judgments and tax liens, and he had a negative balance in his bank account. Gov't Exs. 531, 532; TT 848-50, 858. He was a most unlikely candidate to get involved in trading Dakota Plains stock.

Gilbertson personally negotiated the details of the sale of the 50,000 freely tradeable shares to Hoskins (even to the point of editing the proposed sales agreements) and provided Hoskins with the money to purchase the shares.  TT 661-62, 681-83, 853-54, 857-58.  Gilbertson did not pay for the shares directly; instead, he routed his money through Hoskins to conceal his involvement in the transaction.  TT 853-54, 857-58, 872-73.  Gilbertson also arranged for Hoskins to open a trading account at Wilson-Davis & Company, a boutique brokerage in Utah.  Gov't Ex. 308; TT 656, 687-89.  In opening the account, Hoskins falsely represented himself as a sophisticated investor.  TT 866.  Hoskins also made multiple false representations in the share-purchase agreements, including that he was an "accredited investor," that he was not buying the stock in concert with anyone else, and that he was solvent.  TT 702-05, 878-79.

The reverse merger closed on March 22, 2012, and public trading began the following day.  TT 384, 882.  Again, the size of Gilbertson's bonus under the clause that he had inserted into the consolidated notes depended on the price at which the stock sold during the 20 days following the reverse merger.  Hoskins sold shares for about $12 throughout this 20-day "bonus" period; in fact, Hoskins was the largest single seller during that period, with 32 percent of total sales.  Gov't Exs. 366, 367; TT 1170.  Phone records and emails strongly indicate that Gilbertson directed Hoskins's trading activity.  For example, Gilbertson and Hoskins spoke by phone twice during the first 30 minutes

of public trading.  Gov't Ex. 391 at 10; TT 887-88.  In between these calls, Hoskins called

his broker, suggesting that Hoskins called his broker at Gilbertson's direction and then

reported back to Gilbertson about the conversation.  Gov't Ex. 391 at 10; TT 859-60.  On

April 4, Hoskins emailed his broker "wondering why I only have 25pct of the volume."

Gov't Ex. 402.  At about the same time, Gilbertson texted Howells complaining that

Hoskins "should be getting more than 25pct of the volume."  Gov't Ex. 404a at 7.  When

they sent their respective messages, Hoskins and Gilbertson were both in Sarasota,

Florida.  TT 892-93.

Howells testified that he knew that Gilbertson was trying to manipulate the stock

price, and that he aided and abetted Gilbertson's scheme by calling Hoskins's broker

and pressuring him to increase Hoskins's volume.  TT 727-30.  Howells admitted that,

in so doing, he was unlawfully "[m]anipulating the sell side."  TT 732.  A little while

later, Gilbertson sent a text to Howells essentially admitting that Gilbertson was

manipulating the stock price.  Gov't Ex. 404a at 8; TT 730-31 ("they would be

participating on sales at 7 bucks not 12 were it not for my involvement").  When

Howells later learned of the bonus provision under which Gilbertson would be owed

millions of dollars by Dakota Plains—a provision that, as Howells put it, "destroyed"

the company's balance sheet—Howells was both "livid" and scared.  TT 734-35.

Howells complained to Gilbertson, who paid hush money to Howells in the form of

50,000 shares in Dakota Plains and then disguised the payment by entering into a bogus consulting agreement with Howells. TT 736, 739-45.

While using Hoskins and Howells to manipulate the sell side, Gilbertson was using Nicholas Shermeta (and likely others) to manipulate the buy side. Shermeta was a stockbroker who had a longstanding professional and personal relationship with Gilbertson. TT 961, 963-67. Shermeta testified that Gilbertson instructed him to line up buyers to purchase the stock at $12 per share. TT 980-82, 987. Gilbertson also told Shermeta that he had other buyers who were going to be purchasing at $12 or higher. TT 981, 991-92. Per Gilbertson's instructions, Shermeta (on his own behalf and on behalf of his clients) purchased the stock at or around $12 per share throughout the first 20 days of trading. TT 981-82, 988, 991-92, 996-97, 999-1001, 1014-18, 1022-27. Shermeta admitted that he did so even though the transactions made no economic sense for either him or his clients; he made the purchases only because Gilbertson directed him to do so in order to establish and maintain the $12 share price. TT 981, 1017-18, 1026. Just as Hoskins was the biggest seller, Shermeta was the biggest buyer, with nearly 54 percent of the volume. TT 1169.

The average price of the stock during the crucial 20-day trading period was $11.63, which triggered a bonus payment of nearly $33 million to Gilbertson and the other noteholders. Gov't Ex. 494; TT 410-11. After the first 20 days of trading—that is,

after Gilbertson no longer had an incentive to manipulate the price of the stock—the stock price steadily declined.  Trading was minimal after May and by the middle of August the stock was below $7 per share.  TT 1027, 1177-78; Gov't Ex. 368.  Dakota Plains eventually went bankrupt.  TT 487.  When the Securities and Exchange Commission ("SEC") later questioned Hoskins about his role in Gilbertson's scheme, he repeatedly perjured himself—claiming, for example, that he had decided to get into stock trading because "I had extra time on my hands" and that he had educated himself about stock trading by "Googl[ing] 'trading stocks.'"  Gov't Ex. 626 at 20-21.

## II.  ANALYSIS

### A.  *Standard of Review*

#### 1.  Acquittal

Under Fed. R. Crim. P. 29, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  In considering a Rule 29 motion for acquittal, the court must view the evidence in the light most favorable to the government, resolve all evidentiary conflicts in the government's favor, and accept all reasonable inferences drawn from the evidence that support the jury's verdict.  *United States v. Cook*, 603 F.3d 434, 437 (8th Cir. 2010).  The motion should be granted only if no reasonable jury could have found the defendant guilty.  *Id.*

## 2. New Trial

Under Fed. R. Crim. P. 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." "In ruling on a motion for a new trial, a district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and evaluate for itself the credibility of the witnesses." *United States v. Collier*, 527 F.3d 695, 701 (8th Cir. 2008). But a motion for a new trial should be granted only where "the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred . . . ." *Id.* (citation and quotations omitted). A court's authority to grant a new trial on the basis that the verdict is against the weight of the evidence must be "exercised sparingly and with caution." *Id.*

### B. *Gilbertson's Motion*

Gilbertson argues that there is insufficient evidence that he schemed to inflate the price of Dakota Plains stock, engaged in deceptive conduct, made any misrepresentations or engaged in any active concealment, or acted with intent to defraud. He also argues, with respect to the securities-fraud charges, that the government failed to prove that he made any affirmative misstatements or violated any duty to disclose.

The Court disagrees and finds that there is ample evidence to support the jury's verdict. First and foremost, two witnesses (Howells and Shermeta) testified that, at Gilbertson's direction, they worked in concert with Gilbertson (Howells on the sell side, Shermeta on the buy side) to inflate the price of Dakota Plains stock. That evidence alone gave the jury a sufficient basis to find that Gilbertson schemed to inflate the stock price, engaged in deceptive conduct and active concealment, and acted with intent to defraud. It is also sufficient to establish securities fraud under 15 U.S.C. § 78j(b) and Rule 10b-5. *See Sante Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977) (recognizing that Rule 10b-5 prohibits trading practices that are intended to mislead investors by artificially affecting market activity).

In addition to the testimony of Howells and Shermeta, plenty of other evidence demonstrated deception, fraudulent intent, and active concealment, including Gilbertson's deceptive role in the formation of Dakota Plains; his careful orchestration of all of the elements of the scheme; his insistence on the purchase of more than half of the freely tradeable shares as a condition of the reverse merger; the steps he took to conceal this condition; his use of Hoskins to conceal his involvement in the scheme; his routing of funds through Hoskins to hide the fact that he was supplying the money to Hoskins; and his instruction to Howells to keep the transactions "strictly confidential."

Gilbertson points out that Hoskins's purchase of the shares—and Gilbertson's active concealment of his involvement in that transaction—occurred before the 20-day bonus period. Gilbertson does not explain why this fact is relevant, however. The evidence showed that Gilbertson took these steps as part of a single scheme to manipulate the price of Dakota Plains stock—a scheme that included steps that occurred before, during, and after the 20-day bonus period.

Gilbertson also contends that this conduct cannot establish a concealment-based attempt to defraud because Howells told Dakota Plains' figurehead CEO that an associate of Gilbertson's was purchasing 50,000 freely tradeable shares. TT 759. But that is a long way from disclosing to the company and its investors that *Gilbertson* insisted on this purchase as a condition of the reverse merger, that *Gilbertson* insisted that the condition be kept "strictly confidential," and that *Gilbertson* used his associate (who was dead broke and who had zero experience trading stocks) to conceal his own involvement in the purchase and trading of the stock. Moreover, regardless of what *Howells* may or may not have disclosed, the fact remains that *Gilbertson* engaged in active concealment by structuring the purchase to hide his involvement and instructing Howells to keep it confidential. Likewise, Howells's disclosure does not change the fact that Gilbertson concealed the scheme—and his involvement in it—from the investing public.

Gilbertson also argues that there is insufficient evidence that the stock traded at an artificially inflated price. Relatedly, he argues that there is no evidence that knowledge of his scheme would have been material to a reasonable investor. As the Court instructed the jury, however, success is not an element of any of Gilbertson's crimes. ECF No. 214 at 12 ("It is not necessary that the government prove . . . that the alleged [wire-fraud] scheme actually succeeded in defrauding anyone . . . ."); *id.* at 13 ("For purposes of determining whether a defendant has committed the crime of conspiracy to commit securities fraud, it does not matter whether the crime of securities fraud was actually committed or whether the alleged participants in the agreement actually succeeded in accomplishing their unlawful plan."); *id.* at 18 ("It does not matter whether the alleged unlawful [securities-fraud] scheme was successful or not . . . .").

Even if proof of success were necessary, the jury had a sufficient basis to find it. The purpose of the scheme was not to push the price of the stock to a particular point by a particular date so that it could be sold on that date for profit. Nor was the purpose of the scheme to perfectly match prearranged sales with prearranged purchases. Instead, the purpose of the scheme—which, again, involved not only Gilbertson, Hoskins, Howells, and Shermeta, but other (undisclosed) participants that had been lined up by Gilbertson, TT 981—was to ensure that the average selling price of Dakota Plains stock over the 20-day bonus period was higher than it would have been without Gilbertson's

manipulation, thereby increasing the amount of the bonus payment to which Gilbertson would be entitled. The evidence that Hoskins was the biggest individual seller (even though he had no plausible reason to be jumping into the penny-stock market) and that Shermeta was the biggest individual buyer (even though he had no plausible reason to be buying Dakota Plains stock) during the first 20 days of trading—along with evidence that the stock price steadily declined after the 20-day period—gave the jury a sufficient basis to conclude that the scheme had succeeded.

As for materiality, the jury could easily find that a reasonable investor would have found material the fact that a corporate insider had, through a nominee, purchased more than half of the freely tradeable stock and was directing that nominee and others to trade the stock at pre-arranged prices for the purpose of triggering tens of millions of dollars in bonus payments that would likely cripple the corporation. Indeed, it is difficult to imagine that anyone considering buying or selling Dakota Plains stock would *not* want to know of Gilbertson's machinations. That the bonus provision itself was public knowledge does not render immaterial the fact that Gilbertson schemed to manipulate the price in order to inflate the bonus. In short, the jury had an ample basis on which to convict Gilbertson.

Finally, Gilbertson moves, in the alternative, for a new trial. As noted above, a motion for a new trial should be granted only where "the evidence preponderates

sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred . . . ." *Collier*, 527 F.3d at 701 (citation and quotations omitted). Given the ample evidence of Gilbertson's guilt, there was no miscarriage of justice. Indeed, having presided over the trial, the Court has no doubt that Gilbertson committed the offenses of which he was convicted (and, for that matter, the one offense of which he was acquitted). Much of Gilbertson's argument consists of carefully parsing the trading activity to contend that his scheme did not *in fact* affect the price of the stock, and then working backward from that premise to argue that he therefore did not *intend* to manipulate the price. The Court, like the jury, rejects this non-sequitur. Gilbertson's motion is denied.

### C. *Hoskins's Motion*

Hoskins argues that there is insufficient evidence that he knew of any scheme to manipulate the price of Dakota Plains stock. The Court disagrees. To begin with, there was circumstantial evidence that Hoskins was aware of the scheme. For example, given that Hoskins had no money and no experience trading stock, his sudden desire to open an account at a boutique brokerage in Utah in order to amass more than half of the small amount of Dakota Plains's freely tradeable stock so that he could trade heavily in it during the first 20 days after it went public provided strong evidence that Hoskins was up to no good—and knew that he was up to no good. That evidence was bolstered

by the fact that Hoskins lied again and again on the forms that he had to fill out in order to open the account and purchase the stock—and by the fact that Hoskins lied again and again to the SEC when later questioned about his activities.  Likewise, there is ample circumstantial evidence that Gilbertson was directing Hoskins's trading activity—i.e., that Hoskins knew that he was being used as a decoy—which strongly suggests that Hoskins was aware of the fraudulent nature of the scheme.

Setting that aside, the jury convicted Hoskins only of those counts that pertained to conduct (1) in which Hoskins had been personally involved and (2) that occurred on or after April 4, 2012, the day that Hoskins sent an email asking why he only had 25 percent of the trading volume.  The jury was entitled to conclude that Hoskins's email was dictated by Gilbertson and sent at his direction—and that, by this point, Hoskins must have known that he was involved in a fraudulent scheme.

Hoskins next argues that, because the jury acquitted *Gilbertson* of Count 12, *Hoskins* must also be acquitted of that charge.  Count 12 charged Gilbertson with wire fraud—and Hoskins with aiding and abetting wire fraud—in connection with an April 27, 2012 wire transfer of funds to Hoskins.  *See* Gov't Ex. 384.  As Hoskins notes, the Court instructed the jury that, in order to find Hoskins guilty of aiding and abetting wire fraud, the jury had to find beyond a reasonable doubt that someone else committed all of the elements of that crime.  ECF No. 214 at 8.  Because the jury did not

find that Gilbertson commit the crime charged in Count 12, Hoskins argues, the jury was precluded from convicting him of aiding and abetting that crime.

Hoskins's argument is foreclosed by Eighth Circuit precedent. According to the Eighth Circuit, as long as there is sufficient evidence to support a conviction, seemingly inconsistent verdicts do not require acquittal. *United States v. Opare-Addo*, 486 F.3d 414, 416-17 (8th Cir. 2007). There is sufficient evidence to support Hoskins's conviction for aiding and abetting wire fraud in connection with the April 27 wire transfer. Thus, the alleged inconsistency in the verdicts does not give Hoskins a right to relief. Hoskins's motion for acquittal is denied.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.     The motion of defendant Douglas Hoskins for acquittal [ECF No. 232] is DENIED.

2.     The motion of defendant Ryan Gilbertson for acquittal or, in the alternative, a new trial [ECF No. 269] is DENIED.

Dated:  November 13, 2018                    s/Patrick J. Schiltz
                                             Patrick J. Schiltz
                                             United States District Judge